United States District Court
For the Northern District of California

1

2

3

4          UNITED STATES DISTRICT COURT

5          NORTHERN DISTRICT OF CALIFORNIA

6          OAKLAND DIVISION

7

8    MICHAEL J. CORBETT,                          No. C 12-2070 PJH (PR)

9                    Petitioner,              **ORDER DENYING PETITION
                                              FOR WRIT OF HABEAS
10      vs.                                   CORPUS AND GRANTING
                                              CERTIFICATE OF
11   MATTHEW CATE,                            APPEALABILITY**

12                    Respondent.
     _____/

13

14          This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. §

15   2254.  The court ordered respondent to show cause why the writ should not be granted.

16   Respondent filed an answer and a memorandum of points and authorities in support of it,

17   and lodged exhibits with the court.  Petitioner responded with a traverse.  For the reasons

18   set out below, the petition is denied.

19                                    **BACKGROUND**

20          On November 30, 2006, a jury found petitioner guilty of several counts of aggravated

21   sexual assault of a child by rape or penetration by a foreign object, commission of a lewd or

22   lascivious act on a child by force or fear and violation of a protective order.  Clerk's

23   Transcript ("CT") at 421-31.  On April 14, 2008, the trial court sentenced petitioner to 24

24   years plus 60 years to life.  *Id.* at 648-54.  On January 5, 2011, the California Court of

25   Appeal reversed the finding of violating a protective order, but otherwise affirmed the

26   judgment.  *People v. Corbett*, 2011 WL 18733 (Cal. App. 6 Dist. 2011).  On April 20, 2011,

27   the California Supreme Court denied petitions for review in both the direct appeal and a

28   habeas petition.  Answer, Exhs. K, L.

The facts, as described by the California Court of Appeal, are as follows:

A. Prosecution's case
1. Testimony regarding the victim's molestation
The victim, who was born in December 1996, is the foreign-born adopted daughter of [petitioner's] wife.  FN3 [Petitioner] and the victim's mother were married in 2002 and, during 2005 and through early July 2006, the victim lived with [petitioner] and her mother in San Jose.  A longtime friend of [petitioner's], Willis Gaylord, also lived in the house.

   FN3. We sometimes also refer to her as the victim's mother.

On at least four occasions between June 2005 and June 2006, [petitioner] sexually abused the victim.  The molestations took place in the house when the victim's mother was either at work or school.  The victim testified that Gaylord may also have been home at the time, but he was always in his bedroom with the door closed when the molestations occurred.

Prior to molesting her, [petitioner] would show the victim pornographic images on his computer, and would also promise to buy her things.  Each time, she would tell him to stop and tried to move away from him, but that just made him angry.  Sometimes he allowed her to leave the room, but would then convince her to return to bed.

The first molestation took place in [petitioner's] bedroom during the daytime.  He put his hand under the victim's panties and rubbed her vagina with his hand.

The second molestation took place at night in [petitioner's] bedroom. [Petitioner] asked the victim to lick his penis, but she refused.  He told her to lie down on the bed, and then he rubbed her vagina with his hand. [Petitioner] pulled down her pants and underwear, held both of her hands down and rubbed his penis on her vagina.  When the victim asked him to stop, he told her to wait.  [Petitioner] ejaculated on his hand, and washed up in the bathroom.

The third molestation also took place at night, but this time in the victim's bedroom.  [Petitioner] came to her room, pushed her onto the bed and touched her vagina.  He asked her to lick his penis, but she again refused. [Petitioner] pulled down her shorts and underwear, rubbed his penis on her vagina and ejaculated onto his hand.

The fourth and final molestation took place in [petitioner's] bedroom on an evening in June 2006.  The victim was sitting on the bed and [petitioner] was standing next to her.  He asked her to lick his penis and she refused. This time, [petitioner] made her put his penis in her mouth.  He grabbed the victim's arms, pushed her down on the bed and touched her vagina under her shorts.  He then pulled down her shorts and panties and "st[u]ck his hand in my inside."  She also said that "[h]e would put his hand inside, he would start rubbing it and touching it."  [Petitioner] took his penis out of his boxers and "sat" on the victim, rubbing his penis on her vagina. [Petitioner] told the victim he was coming and then he ejaculated onto his hand.

Every time that [petitioner] rubbed his penis against the victim's vagina, she would tell him to stop as it hurt, but [petitioner] would respond, "[W]ait until I come." He would subsequently ejaculate and "white stuff came out." It "looked gooey and sticky.... [¶] ... [¶] Then he would go to the bathroom and wash it."

After each molestation, [petitioner] told the victim that he would be mad if she told her mother. He also said that if she told anyone, [petitioner] would have to go to jail and that her mother would be hurt.

On July 5, 2006, [petitioner's] youngest daughter from a prior marriage FN4 came to visit. The next day, [petitioner] took both his youngest daughter and the victim with him to work, and after work, to a concert in a park. At some point before going to the park, [petitioner] called his wife and arranged for her to meet them there.

> FN4. [Petitioner] had two daughters from a prior relationship with a woman named Michelle, both of whom were born before he and Michelle were married. To preserve their anonymity and to distinguish them from the victim, we henceforth refer to them as the "eldest daughter" and the "middle daughter." Michelle had a third daughter after she and [petitioner] divorced, but from the record it appears she is not [petitioner's] biological child. For the sake of convenience, we shall refer to her as the "youngest daughter."

After his wife arrived, she got into an argument with [petitioner] about his youngest daughter. [Petitioner] took the victim home while his wife drove home separately with his youngest daughter. On the way home, [petitioner] told the victim that he intended to divorce her mother.

[Petitioner] and his wife resumed their argument when they got home. [Petitioner] told her that the marriage was over and left the house. Later, the victim called him, told him she loved him and missed him and wanted him to come home.

The next morning, the victim decided to tell her mother that [petitioner] had been touching her because he had been getting progressively angrier when she refused to do what he asked. Once she told her mother, she was relieved because [petitioner] would not be able to touch her anymore. Later that day, the victim also separately told [petitioner's] youngest daughter and Gaylord about [petitioner] molesting her.

When [petitioner] came home, the victim's mother had the victim confront him with her claims. [Petitioner] became angry and he argued with his wife in the kitchen while the victim and his youngest daughter watched. The victim testified that, during this argument, [petitioner] put his arm around his wife's neck and pinned her down on the kitchen table.

[Petitioner's] youngest daughter took the victim out in the backyard, and [petitioner's] wife called the police. Before the police arrived, [petitioner] went into the backyard and told the victim "not to tell the police or else he'll have to go to jail."

3

Officer David Cendejas responded to the call and first talked briefly to [petitioner]. He then interviewed the wife, followed by the victim. While he spoke to the victim, her mother sat silently behind her. She did not interrupt or touch the victim at any time, and throughout the interview, the victim never looked at her mother, but looked only at the officer. She told him that [petitioner] had been touching her for about a year. Officer Cendejas arrested [petitioner].

Later that day, while interviewing [petitioner], Detective Adam Tovar showed him a fabricated lab report which indicated that [petitioner's] semen had been found on the victim's underwear. [Petitioner] told Detective Tovar that that was not possible because he had a medical condition which prevented him from ejaculating.

On July 13, 2006, Physician Assistant Mary Lou Ritter performed a Sexual Assault Response Team (SART) exam on the victim. Ritter found nothing noteworthy, but testified that was not necessarily inconsistent with sexual molestation. According to Ritter, an erect penis could penetrate the labia majora without penetrating the vagina and without causing injury. Though penetration of the vagina by an erect penis would tear the victim's hymen, Ritter testified that any such tear could have healed without leaving a visible trace.

On July 20, 2006, Detective Tovar interviewed the victim at the child interview center, during which she described the four molestations by [petitioner]. A video recording of this interview was played for the jury.

. . . .

Detective Tovar testified that [petitioner's] wife called him about a letter Gaylord received from [petitioner] after his arrest. Detective Tovar went and retrieved the document from Gaylord. In the letter, [petitioner] told Gaylord that [petitioner's] wife needed to contact and work with [petitioner's] attorney. The letter said, in part, "If [my wife] will play alon[g] with him I'll get out of this. If not I'm looking at *40 years.*" (Emphasis in original.) Gaylord showed the letter to [petitioner's] wife, since the second half of it addressed her directly, as follows: "[Wife's name] you have got to tell Charles Kramer [i.e., [petitioner's] attorney] about the time when you played with me in my sleep & made me cum [ sic ]. It was [the victim]'s pan[ti]es you used to clean me with. Just tell the truth babe. Nothing will happen to you. I'll still stand by you."

3. Evidence of prior sexual abuse
a. Testimony of [petitioner's] eldest daughter [Faryn]
The eldest daughter, who was 19 when she testified, had not seen [petitioner] since she was 12 years old. When she was four years old, she went camping with her parents and the middle daughter. Her mother and sister were in one sleeping bag while she shared a sleeping bag with [petitioner]. She recalls [petitioner] fondling her vagina over her clothes as they lay in the sleeping bag. Another time, when she was four years old, [petitioner] put his hand on her bare vagina. She told her mother about what happened, and her parents split up.

When the eldest daughter was 12 years old, she was living in South Carolina and [petitioner] was living in Alabama. She was in a rebellious

4

United States District Court

For the Northern District of California

stage and was having difficulties living with her mother and the middle daughter. Although she remembered that [petitioner] had touched her when she was four years old, she did not think he would do that again, so she had her mother contact him to see if she could stay with him. She ended up moving in with [petitioner] and slept on his couch for about a month.

One time while living there, she saw [petitioner] lying on a bed in his boxers. His legs were open and his testicles were exposed. When she told him to close his legs, [petitioner] laughed.

Another night, the eldest daughter was feeling ill from flu or food poisoning. She told [petitioner] that she was not comfortable on the couch and he told her to sleep in his bed, head to foot. As she dozed off, [petitioner] began rubbing her feet. She pretended to be asleep, and [petitioner] moved his hands up her leg and massaged her inner thigh. He then rubbed her vagina over her underwear. The eldest daughter got up, went into the bathroom and vomited. When she came out, she saw that [petitioner] was pretending to be asleep, so she ended up sleeping in the bathroom.

The eldest daughter said that when the middle daughter told her about the crimes that [petitioner] was charged with, she was afraid that no one would believe the victim. After she was subpoenaed to testify, [petitioner] called her from jail and told her not to bring up what he had done to her. He told her not to answer the phone and offered her land in Alabama worth $30,000.

b. Testimony of [petitioner's] middle daughter [Tayla]
The middle daughter, who was 17 at the time she testified, said that she did not remember [petitioner] from her childhood, but that she visited him for two weeks in the summer of 2004. The middle daughter got along with [petitioner]'s wife and the victim and believed that the wife was very loving toward the victim. However, the wife spoke Spanish and could only partially understand English and [petitioner] would sometimes make fun of his wife in front of her, knowing that she would not understand.

During her visit, [petitioner] took the middle daughter for a professional photo shoot, which included pictures of her in bathing suits. She later came upon [petitioner] looking at some of these photos on his computer, zooming in on her breasts. He told her she was "raw" and said "I can see the exact shape of your breast."

The middle daughter also saw [petitioner] sleep next to the victim and noticed that he would "spoon" her in an unusually intimate way. On one occasion, the victim came into the room and said that her hernia hurt. [Petitioner] placed the victim down on the bed and pulled down her pants and underwear. The middle daughter saw [petitioner] put his fingers on the victim's vagina and move them in a circular motion.

After the middle daughter returned to South Carolina with new clothes and other gifts, the eldest daughter told the middle daughter that she had fabricated being molested by [petitioner] and she now wished to get in contact with him. However, she subsequently told the middle daughter "countless" times that [petitioner] did, in fact, molest her. When the middle

daughter asked why the eldest daughter was changing her story again, the eldest daughter said it was because she was envious of the gifts and the clothes the middle daughter had received from [petitioner] during her visit.

Before trial, [petitioner] called the middle daughter and questioned her about what she had said to the police. She said that [petitioner], in that phone conversation, told her "[she] was just as guilty because [she] knew and [she] didn't say anything." The middle daughter said that [petitioner's] accusation upset her, "because I-I had an idea, but I didn't say anything."

. . . .

B. Defense case
1. Dr. Coleman's testimony
Dr. Lee Stewart Coleman testified as an expert in pediatric genital examinations for potential sexual abuse, memory suggestibility and the potential impact of interviewing techniques and accommodation. Dr. Coleman criticized Ritter's SART exam report for failing to include a history of the victim's most serious allegations. In addition, according to Ritter's report, the opening of the victim's vagina was "unusually small" and Dr. Coleman testified that it was "not possible ... for something like a penis to go inside through the hymen of that size without major injury." If the victim's vagina had in fact been penetrated by a penis, Dr. Coleman testified, there would have been tearing, bruising and bleeding and her discomfort would have been noticeable to anyone taking care of the victim even if the injuries eventually healed.

. . . .

Dr. Coleman believed that Detective Tovar's interview of the victim was not a neutral evaluation, and testified that the detective used leading questions in the interview. He also testified that the detective should have asked more questions about the victim's relationship with her mother.

On cross-examination, Dr. Coleman admitted that he had never personally conducted a SART exam, but he disagreed with Ritter's conclusion that a normal exam was consistent with allegations of sexual abuse. He also testified that it would be unusual for an adult to convince a child to lie about abuse, but more commonly, what would occur is that the adult honestly believes that abuse has occurred and that belief is consciously or unconsciously impressed on the child.

2. The victim's mother's testimony
The victim's mother testified that she was married to [petitioner] for four years and four months. Though she was satisfied with the marriage, [petitioner] was not. She admitted that [petitioner] did not help her with her immigration papers, but denied that was why she was upset with him.

. . . .

[Petitioner's] wife also testified that she recognized the letter [petitioner] sent to Gaylord, but denied that she used the victim's panties to masturbate [petitioner] to climax as [petitioner] wrote.

6

United States District Court

For the Northern District of California

3. Testimony of Antonio Flores and John Levisay

Antonio Flores, who worked with [petitioner] and Gaylord, testified that on the evening of July 6, 2006, [petitioner's] wife told him that she was going to call the police on [petitioner] that night.

John Levisay testified that he spoke to [petitioner's] wife on August 7, 2006. Though she did not say to him that her marriage to [petitioner] was a marriage of convenience, she did say her citizenship application was not progressing as it should have been. At no time during that conversation did she mention the victim.

4. Gaylord's testimony FN5

> FN5. Gaylord died prior to trial. Accordingly, a transcript of his prior testimony was read into the record.

Gaylord had known and worked with [petitioner] for most of his life and lived with [petitioner] and his wife during the relevant time period. On the afternoon of July 6, 2006, [petitioner] and his wife had an argument. During that argument, Gaylord heard [petitioner's] wife say that she "was going to destroy [[petitioner]] and going to take everything that he had, and to make sure that he went to jail." [Petitioner] then left the house.

Gaylord testified that when [petitioner] returned the next day, he told his wife to leave the house and the two argued. Gaylord had never seen [petitioner's] wife be violent towards [petitioner], but that day, she threw food at [petitioner], hit him with a cooking pot and grabbed his sunglasses off his face. She said that she "was going to 'ruin his fucking life.' "

He further testified that [petitioner's] wife got the victim to obey her by yelling, pulling her hair and aggressively spanking her. The wife would also sporadically threaten to send the victim back to the country where she was born, where she would have nothing to eat and nowhere to sleep. Gaylord said that the victim looked scared when the mother would say such things to her.

After [petitioner] was in jail, the police responded to the house because of an argument between the victim and [petitioner's] wife.

On cross-examination, Gaylord testified that [petitioner] told his wife to move out on the night of July 6, 2006. The next morning, [petitioner's] youngest daughter brought the victim into Gaylord's room and the victim told him that [petitioner] had been touching her. Gaylord called [petitioner] and told him to return home. When [petitioner] arrived, he began arguing with his wife. During the argument, the wife grabbed [petitioner], "threw a pot of food on him," and was "tearing things up." In response, [petitioner] "grab[bed] her" and "[sat] her down." After the argument, [petitioner] went out to the backyard and talked to the victim, then the police arrived.

. . . .

5. [Petitioner's] testimony

[Petitioner] testified that he and his former wife, Michelle, did not have a good marriage. They never went camping, and he never shared a sleeping bag with his eldest daughter. He and Michelle got divorced when

United States District Court

For the Northern District of California

the eldest daughter was four years old, and contrary to the eldest daughter's testimony, [petitioner] was the one who filed for divorce.

When the eldest daughter was 12 years old, he lived in Alabama with his son and Gaylord.  Michelle arranged for the eldest daughter to stay with him until Christmas, but she was unhappy and decided to move back to live with her mother after only eight weeks.  While she stayed with him, she chose to sleep on the couch, rather than on an extra bed in his son's room.  He denied ever exposing his testicles to her.

[Petitioner] testified that she did come to his room one night complaining of a stomach ache and fell asleep on his bed.  He did not touch her that night, and she did not end up sleeping in the bathroom.  The next morning, she said she did not want to go to school because she was still sick, so [petitioner] told his son to stay home with her.

When [petitioner] got home from work that day, his eldest daughter said she wanted to call her mother, so [petitioner] drove her into town to use a payphone.  He told her that he wanted to speak to her mother when she was done.  When she returned to his van, he asked her why she did not let him talk to Michelle.  He got out of the van to call her himself, while his eldest daughter became very agitated and screamed at him not to do so.  [Petitioner] ignored her and called anyway, and Michelle told him that his eldest daughter had accused him of molesting her.

[Petitioner] immediately drove his eldest daughter to a hospital. He approached the first nurse he saw and explained that his eldest daughter had accused him of molestation.  [Petitioner] remained at the hospital to talk to the police later that night.  However, he refused to take his eldest daughter home with him afterwards.

[Petitioner] acknowledged calling his eldest daughter from jail prior to the trial, but he denied offering her $30,000 not to testify.

[Petitioner] testified about the middle daughter's visit.  Before she came to visit and again when she arrived, he discussed with her the accusations that the eldest daughter had made about him.  However, after she arrived, the middle daughter said that her sister had recanted.  When the middle daughter told him she was interested in modeling, he arranged a photo shoot for her.

He testified that the victim did have a hernia, but denied ever pulling down her pants and rubbing her groin as the middle daughter testified.  [Petitioner] said that the more the victim would play, the more painful her hernia would become and she would have to lie down, loosen her pants and relax.

[Petitioner] admitted to contacting his middle daughter when he was in jail, but he never told her not to talk to the police.

With respect to his wife, [petitioner] testified that she asked him to marry her so she could get her citizenship.  In exchange, she promised to help around the house, cooking and cleaning. He was not in love with her, though they did have sex a few times.  After they got married, however, his wife often complained that he did not give her enough help in resolving

her immigration status.  [Petitioner] admitted that, over time, he stopped trying to help her since two attorneys had told him there was nothing they could do.

[Petitioner] testified that he has had erectile dysfunction and hypogonadism syndrome since 1995.  He takes a series of medications, including testosterone, for his conditions but has a severely reduced sperm count and sex drive.  In addition, his ejaculate is not white in color. He was unable to take Viagra due to certain side effects, and though Levitra seemed to help initially, it gradually became less effective. [Petitioner] stated that he could achieve an erection, but it took more time than usual.

According to [petitioner], his wife disciplined the victim by physically and verbally abusing her.  He witnessed her spanking the victim, hitting her with a belt, pulling her hair and calling her a "nasty girl" in Spanish.  His wife would also threaten to send the victim back to the country where she was born, telling her that her diet would be limited to rice and beans and no one would love her.

On July 5, 2006, [petitioner's] youngest daughter came to visit, and his wife did not like her.  The next day, [petitioner] got into a fight with his wife and he took the victim and his youngest daughter with him to work.  After work, he took them to a concert at a park in downtown San Jose. [Petitioner] called his wife and she came to meet them. He kept calling her to tell her where they were, but she kept saying she could not find them. However, [petitioner] then saw that his wife was hiding behind a tree, watching them.  At some point during the concert, his wife took his youngest daughter away without telling him they were leaving.  [Petitioner] drove the victim home and, on the way, he told her that he was going to divorce her mother, which made the victim upset.

[Petitioner] and his wife arrived home at the same time.  He told her that he had reached his limit and wanted to end the marriage, at which point "she went crazy."  His wife started shoving her clothes into garbage bags and throwing them, along with some mirrors and paintings, onto the front lawn.  She said she had given him four years of her life, and he was not going to leave her now that he was finally making money.

[Petitioner] left the house and eventually checked into a motel for the night. That evening, his wife called him and threatened to destroy his life. When he asked her how she would do so, she replied, "You'll see what I got planned for your fucking ass."  Approximately five minutes later, the victim called and said, "Daddy, please come home. I'll do anything to make mama happy."  [Petitioner] told her to not worry and go to sleep because she had to go to school the next day.  [Petitioner] stopped answering the phone, though he received several more messages from his wife and the victim.

The next morning, he went to work. Gaylord called him and said that he should come home because [petitioner's] wife had put the victim up to accusing him of molesting her.  When [petitioner] got home, he argued with his wife about who was going to leave.  [Petitioner] said he would leave, and started packing his things, at which point his wife threw a pot, a glass of water and sunglasses at him.  The pot hit his lip.  [Petitioner] just

9

United States District Court

For the Northern District of California

1    tried to defend himself as best he could.

2    [Petitioner's] wife then came up to [petitioner], holding the victim by the
     arm and told her to tell [petitioner] what she had said.  The victim looked
3    scared and cried.  His wife screamed at the victim, yanked on her arm and
     said, "Tell him."  The victim said, "You touched me a long time ago,
4    daddy."  His wife then said, "I'll destroy you.  I'm going to put you in the
     jail."  She then started kicking and throwing things.  At some point, she
5    grabbed him by the shirt and fell back onto the kitchen table, pulling him
     on top of her.  [Petitioner] kept repeating, "Let me go, let me go.  It's over,
6    it's over."  When his wife released him, she grabbed the telephone, while
     [petitioner] went outside and talked to the victim, trying to calm her down.
7    When he reentered the house, he heard his wife speaking to the police on
     the phone.  [Petitioner] went out front and waited for the police to arrive.
8
     The officers questioned [petitioner] about domestic abuse, then Officer
9    Cendejas went inside to speak to [petitioner's] wife.  When he came back
     out, he placed [petitioner's] under arrest.
10
     Later that day, [petitioner] was interviewed by Detective Tovar.  Detective
11   Tovar asked how [petitioner's] sperm got into the victim's panties.
     [Petitioner] agreed to take a DNA test, but when the detective said the
12   victim described his ejaculate as white, [petitioner] told Tovar he knew he
     was lying.
13
     [Petitioner] admitted that he had some adult material on his computer, but
14   denied ever showing it to the victim.  He also denied putting his finger or
     his penis in the victim's vagina, and denied having her orally copulate him.
15
     On cross-examination, [petitioner] said that his wife did not like either his
16   middle or his youngest daughters and did not like being around them.  She
     was rude towards them and made it clear that she wanted them to leave.
17
     On the day that he was arrested, [petitioner] knew he had been accused
18   of molesting the victim, but his first concern when he got home that day
     was figuring out whether he or his wife would be moving out of the house.
19   He also wanted to make arrangements for his youngest daughter, who
     was visiting, to stay someplace other than the house.
20
     [Petitioner] denied pinning his wife to the table during his argument with
21   her; instead, she grabbed his shirt and leaned back onto against the table,
     pulling him on top of her.  He never hit her or pushed her or put his hand
22   around her neck.

23   [Petitioner] reiterated on cross-examination that the only reason he
     married his wife was to help her obtain citizenship.  However, despite the
24   fact that it was just a marriage of convenience, and even though he
     believed she had framed him with false accusations of child molestation,
25   he testified that he still loved her and missed her.

26   [Petitioner] at first denied ever telling the police that "nothing" came out of
     his penis when he ejaculated; instead, what he said was that his ejaculate
27   was not white, because there was no sperm in it.  Upon further
     questioning, he admitted that he did tell the police both that he did not
28   ejaculate at all and that it had been years since he last ejaculated.

10

United States District Court
For the Northern District of California

1

2   [Petitioner] further testified that in late 2004 or early 2005, his wife
    masturbated him and caused him to ejaculate while he was still asleep.  In
3   the letter he sent to Gaylord from jail, he asked his wife to tell his attorney
    about that incident.

4   . . . .

5   *People v. Corbett*, 2011 WL 18733 *2-11 (Cal. App. 6 Dist., 2011).

6                                **STANDARD OF REVIEW**

7        A district court may not grant a petition challenging a state conviction or sentence on

8   the basis of a claim that was reviewed on the merits in state court unless the state court's

9   adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

10  unreasonable application of, clearly established Federal law, as determined by the

11  Supreme Court of the United States; or (2) resulted in a decision that was based on an

12  unreasonable determination of the facts in light of the evidence presented in the State court

13  proceeding." 28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to

14  mixed questions of law and fact, *see Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09

15  (2000), while the second prong applies to decisions based on factual determinations, *see*

16  *Miller-El v. Cockrell*,  537 U.S. 322, 340 (2003).

17       A state court decision is "contrary to" Supreme Court authority, that is, falls under the

18  first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that

19  reached by [the Supreme] Court on a question of law or if the state court decides a case

20  differently than [the Supreme] Court has on a set of materially indistinguishable facts."

21  *Williams (Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application

22  of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly

23  identifies the governing legal principle from the Supreme Court's decisions but

24  "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The

25  federal court on habeas review may not issue the writ "simply because that court concludes

26  in its independent judgment that the relevant state-court decision applied clearly

27  established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must

28  be "objectively unreasonable" to support granting the writ. *Id.* at 409.

11

1    Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual

2 determination will not be overturned on factual grounds unless objectively unreasonable in

3 light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at

4 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

5                                              **DISCUSSION**

6    As grounds for federal habeas relief, petitioner asserts that: (1) the prosecution

7 failed to provide exculpatory or impeachment material in violation of *Brady v. Maryland*, 373

8 U.S. 83 (1963); and (2) ineffective assistance of trial counsel.

9 **I.   *Brady* Material**

10    Petitioner asserts that he was denied discovery of recordings of phone calls he

11 made from jail to his eldest and middle daughters.

12    **A.  Factual Background**

13        **i.  Pre Appeal Proceedings**

14    Prior to trial, petitioner's trial counsel requested that the prosecutor turn over any

15 recordings of calls that petitioner made to his eldest daughter, Faryn, and his middle

16 daughter, Tayla.  Reporter's Transcript ("RT") at 38.  While in jail petitioner had called both

17 daughters.  However, petitioner had not called the daughters directly but used a three-way

18 phone number to reach them by means of a third party call.  RT at 38-39.  The three-way

19 number allows an inmate the ability to call someone through an unidentifiable or unrelated

20 phone number.  *Id.* at 39.  Other inmates were also using this same three-way number and

21 as a result there were over 250 calls with the phone numbers by at least ten different

22 inmates.  *Id.*  The prosecution had been sifting through all the recorded calls trying to find

23 the proper conversations, but had still not found them.  *Id.*[1]  Trial counsel was satisfied with

24 the explanation.  *Id.* at 40.

25    During trial, the prosecutor informed trial counsel that she would be eliciting

26 ───────────────────

27        [1] It would seem that the three-way numbers are used to impede efforts to find specific
recorded conversations.  The transcript of the recorded conversations from the jail phone
28 specifically reflects a recorded voice stating, "[n]o third party calls are allowed."  CT at 575.

                                                        12

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1  testimony from Tayla regarding one of the jail phone conversations that the prosecutor had

2  just learned of.  RT at 145-46.  The prosecutor had still been unable to find the recorded

3  phone calls in question.  *Id.* at 146.  Trial counsel objected, but was overruled as the trial

4  court accepted the prosecutor's explanation.  *Id.* at 147.  The prosecution again noted that

5  they were not aware of the exact time of the conversation or the phone number used,

6  based on the three-way phone number.  *Id.*

7       As noted above, Faryn testified at trial that petitioner had inappropriately touched her

8  in Alabama when she was younger.  Faryn also testified that petitioner called her from jail

9  prior to trial and told her not to come to court and, with respect to Alabama, not to bring it

10  up.  RT at 208.  When asked by the prosecutor if petitioner had made any promises if she

11  did not say anything about Alabama, Faryn replied, "[t]hirty thousand dollars in land in

12  Alabama."  *Id.*

13       Tayla testified to the inappropriate behavior she witnessed between petitioner and

14  the victim.  Tayla testified that petitioner contacted her regarding this case and told her that

15  she was just as guilty because she knew what happened and did not say anything.  RT at

16  244.

17       Petitioner was found guilty at the conclusion of the trial on November 30, 2006.

18  Petitioner dismissed his retained attorney and was appointed an attorney.  The new

19  attorney subpoenaed jail phone records, and in July 2007, the prosecutor learned that a

20  jailhouse informant had provided information that identified some of the calls petitioner had

21  placed to his daughters.  *Corbett*, 2011 WL 18733 *27.  The phone calls were obtained, the

22  recordings were transcribed and petitioner filed a motion for a new trial.  CT at 571, 612,

23  623.[2]  The trial court denied the motion for a new trial and petitioner appealed.

24              **ii.  California Court of Appeal Opinion**

25       The California Court of Appeal discussed the specific recorded conversations and

26  found there was no *Brady* violation:

27  _____

28       [2] The daughters refer to petitioner as 'David' in the transcripts.  RT at 187-88.

United States District Court
For the Northern District of California

1
2
3
4
5
6

[Petitioner] claims that if the prosecutor had not delayed and withheld discovery of the telephone recordings until after trial, he might have been able to impeach the two daughters' testimony by proving the following: One, he did not offer the eldest daughter money or land in exchange for her not testifying; and two, that he consistently denied wrongdoing in his conversation with the middle daughter, whose bias against him was evident in that conversation, and confronted her about not calling the police if he had done something illegal in front of her.  In our view, however, the recordings do not appear to have any exculpatory value nor do they support [petitioner's] defenses.  The probative value of the recordings was, at best, neutral, and they could just as easily have been favorable to the prosecution.

7
8
9

[Petitioner] also fails to establish that the recordings were material, that is, he fails to show that, had he obtained them, it is reasonably probable the outcome at trial would have been more favorable.  Absent evidence that any of the items was favorable or exculpatory, the delayed or denied discovery does not undermine our confidence in the outcome.

10
11
12
13
14
15
16
17

In the recording of one of his calls to the middle daughter [Tayla], [petitioner] repeatedly calls the middle daughter a liar and eventually asks, "If there was a crime, why didn't you admit to ... why didn't you call the police?  Why didn't you go call the police?"  The middle daughter replied by saying, "You're not gonna [sic] turn this around on me."  This conversation is neither exculpatory, nor is it materially different from what the middle daughter testified to at trial, i.e., that [petitioner] said she was as guilty as he was because she "knew" about the molestation but did not report it.  The details of the conversation support her interpretation that [petitioner] is, in effect, accusing her of being complicit in the victim's molestation.  However, the middle daughter never testified that she knew that [petitioner] was molesting the victim, only that what she witnessed seemed inappropriate.  It was only after she learned that [petitioner] was arrested that she got "upset, because [she] had an idea [that [petitioner] was molesting the victim], but ... didn't say anything."

18
19
20

As to the middle daughter's supposed bias against [petitioner], the recordings do not support this contention, rather what they reflect is the middle daughter's defiance and refusal to be intimidated by [petitioner's] expletive-filled tirade against her for talking to the district attorney.  For example, after the middle daughter told [petitioner] that neither she nor the eldest daughter would defend him in court, the following exchange took place:

21

"[Petitioner]: [W]hat the hell did I ever do to you?

22
23

"[The middle daughter]: You weren't there.  It's not about, it's not about me and [the eldest daughter].  It's about that little girl [i.e., the victim].  She acted way too much like me when I was little and that happened to me.

24

"[Petitioner]: (Laughing)

25

"[The middle daughter]: She acted way too much like me and you're-

26
27

"[Petitioner]: Let me fuckin' tell you something.  You don't even know what the fuck, you, you don't even know what the hell you're talking about.  You don't even know, you know [the victim's mother].

28

"[The middle daughter]: Dad, if I was you I wouldn't yell at me right now.

14

"[Petitioner]: Listen to me. You knew [the victim's mother].  You knew how [she] treated you when you were down here.  She couldn't stand that, you even being near me.  Neither could [the victim] stand you.  You knew how (unintelligible)-

"[The middle daughter]: It does not matter.  That little girl was messed with, Dad.

"[Petitioner]: You are fuckin' sick in your mother-fuckin', fuck you, bitch!"

Likewise, the recording of the eldest daughter's [Faryn] conversation does not conflict with her testimony at trial.  In that conversation, after she and [petitioner] briefly chatted about the case, [petitioner] said he was not worried "unless they talk ... they try to persuade one of you guys into going up against me."  [Petitioner] then asked if she had heard anything from the middle daughter or the mother about testifying against him, but the eldest daughter said she had not.  [Petitioner] then asked about her plans when her husband got out of the military, and said that when he got out of jail he was going to do something with his land in Alabama for "you guys."  He described how he had invested money that the eldest daughter's mother had inherited in land, which was now worth about $30,000, and said that he would sell it and split the proceeds between the eldest daughter and the middle daughter.

Despite the fact that [petitioner] did not explicitly link the offer of land and/or money to the eldest daughter to her refusing to cooperate with the prosecution, such a link could reasonably be inferred and it was not unreasonable that the eldest daughter interpreted her conversation with [petitioner] in this fashion.  The recording is neither exculpatory of [petitioner], nor does it impeach the eldest daughter's testimony.

Consequently, the failure to disclose these recordings was not a *Brady* violation, nor did it violate the prosecutor's statutory discovery obligations.

*Corbett*, 2011 WL 18733 *28-30.

**B.  Legal Standard**

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87.  The Supreme Court has since made clear that the duty to disclose such evidence applies even when there has been no request by the accused, *United States v. Agurs*, 427 U.S. 97, 107 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence*, United States v. Bagley*, 473 U.S. 667, 676 (1985).  Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would

have been different." *Cone v. Bell*, 556 U.S. 449, 469-70 (2009).  "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine confidence in the outcome of the trial.'"  *Smith v. Cain*, 132 S. Ct. 627, 630 (2012) (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)).

In sum, for a *Brady* claim to succeed, petitioner must show: (1) that the evidence at issue is favorable to the accused, either because it is exculpatory or impeaching; (2) that it was suppressed by the prosecution, either willfully or inadvertently; and (3) that it was material (or, put differently, that prejudice ensued). *Banks v. Dretke*, 540 U.S. 668, 691 (2004).

Impeachment evidence is exculpatory evidence within the meaning of *Brady*.  *See Giglio v. United States*, 405 U.S. 150, 154 (1972). "*Brady* information includes 'material . . . that bears on the credibility of a significant witness in the case.'"  *United States v. Brumel-Alvarez*, 991 F.2d 1452, 1461 (9th Cir. 1993) (quoting *United States v. Strifler*, 851 F.2d 1197, 1201 (9th Cir. 1988).

### C. Discussion

Petitioner has failed to demonstrate that the state court opinion was contrary to Supreme Court authority.  A review of the state court decision, the witnesses' trial testimony and the transcripts of the phone conversations does not show a *Brady* violation. The trial testimony of the witnesses is supported by the transcripts of the conversations. Petitioner is unable to show that the evidence is favorable to him, let alone that it was material.  As noted by the state court, the evidence was at best neutral and more likely favorable to the prosecution.

Petitioner argues that his *Brady* claim is meritorious because he maintained his innocence in the phone conversations.  That petitioner stated he was innocent does not impeach the witnesses nor is it material evidence of his innocence.  Of course, petitioner at one point did state to Tayla that if she saw him inappropriately touching the victim, she was culpable for not calling the police.  CT at 634.

16

United States District Court

For the Northern District of California

1       Petitioner also argues that the transcripts do not reflect that he explicitly offered the

2 land in Alabama to Faryn if she did not testify. While this is accurate, Faryn's testimony at

3 trial is not contradicted by the transcript. As noted by the state court, it was a reasonable

4 inference that the proceeds of the sale of the land would be provided if she did not testify.

5 CT at 625-27.

6       What the transcripts do reflect is petitioner attempting to ascertain the intentions of

7 the daughters and attempting to persuade them not to testify for the prosecution. While

8 speaking with Tayla the following occurred:

9       Tayla: I'm telling you that because I'm not speaking in your defense, Dad.

10       [Petitioner]: I don't want you to speak in my defense. I don't want you to
      speak period. How 'bout. Can you do that?

11       . . . .

12       Tayla: If, if someone asks me a question, I'll tell them the answer.

13       [Petioner]: So are you coming to court?

14       Tayla: Huh?

15       [Petitioner]: Have you been subpoenaed to court?

16       Tayla: Not yet.

17       [Petitioner]: Who's supposed to be subpoenaing you?

18       Tayla: I don't know.

19       [Petitioner]: Have you talked to the D.A.?

20       Tayla: Dad, I can't talk to you.

21       [Petitioner]: Listen, Tayla, I am your damn daddy and you gonna turn your
      back on me?

22 CT at 575-76.

23       While speaking with Faryn, the following exchange occurred:

24       [Petitioner]: Well look, first . . . first thing, let me . . . let me (*) and we'll talk. I

25       been . . . I been kind of worried about Tayla because I don't know . . . I told
      you that I (*) cussing at her

26       Faryn: Unh . . . unh.

27       [Petioner]: You don't think she would turn state evidence . . . not turn, well . . .

28

United States District Court
For the Northern District of California

1    well . . . testify for those . . . that defense[3] because she's mad at me, do you?

2    Faryn: Uh, I have no idea.

3    [Petitioner]: Do You think she would?  She would say something against me?

4    CT at 613 (ellipses in original).

5    Later petitioner stated to Faryn, "I let it . . . be fine . . . I mean . . . I just . . . I got court

6    coming up and other that . . . I mean, it's gravy unless they talk . . . they try to persuade

7    one of you guys into going up against me."  CT at 624 (ellipses in original).

8    The transcripts also reflect the daughters repeatedly stating that their testimony is

9    and will be the truth, despite petitioner cursing and yelling at them.  A review of the

10   transcripts indicates that they were not favorable to petitioner, let alone material, and the

11   state court decision was not an unreasonable application of Supreme Court authority.  This

12   claim is denied.  To the extent petitioner argues there was prosecutorial misconduct by

13   eliciting false testimony from these witnesses, any such claim is denied as it is refuted by

14   the record of the phone calls.

15   **II.    Ineffective Assistance of Counsel**

16   Petitioner contends that trial counsel was ineffective for being under the influence of

17   drugs, failing to obtain the jail phone calls and for not properly responding to prosecution

18   objections.

19   **A.  Legal Standard**

20   A claim of ineffective assistance of counsel is cognizable as a claim of denial of the

21   Sixth Amendment right to counsel, which guarantees not only assistance, but effective

22   assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The

23   benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so

24   undermined the proper functioning of the adversarial process that the trial cannot be relied

25   upon as having produced a just result.  *Id*.

26   In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner

27   _____

28   [3] Based on the context of the conversation, it seems petitioner was referring to the prosecution and he said 'defense' by mistake.

United States District Court

For the Northern District of California

1    must establish two things.  First, he must establish that counsel's performance was

2    deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing

3    professional norms.  *Strickland*, 466 U.S. at 687–88.  Second, he must establish that he

4    was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable

5    probability that, but for counsel's unprofessional errors, the result of the proceeding would

6    have been different."  *Id.* at 694.  A reasonable probability is a probability sufficient to

7    undermine confidence in the outcome.  *Id.*

8        The *Strickland* framework for analyzing ineffective assistance of counsel claims is

9    considered to be "clearly established Federal law, as determined by the Supreme Court of

10   the United States" for the purposes of 28 U.S.C. § 2254(d) analysis.  *Cullen*, 131 S. Ct. at

11   1403.  A "doubly" deferential judicial review is appropriate in analyzing ineffective

12   assistance of counsel claims under § 2254.  *See id.* at 1410–11.  The general rule of

13   *Strickland*, i.e., to review a defense counsel's effectiveness with great deference, gives the

14   state courts greater leeway in reasonably applying that rule, which in turn "translates to a

15   narrower range of decisions that are objectively unreasonable under AEDPA."  *Cheney v.*

16   *Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (citing *Yarborough v. Alvarado*, 541 U.S.

17   652, 664 (2004)).  When § 2254(d) applies, "the question is not whether counsel's actions

18   were reasonable.  The question is whether there is any reasonable argument that counsel

19   satisfied Strickland's deferential standard."  *Harrington*, 131 S. Ct. at 788.

20        To demonstrate deficient performance, a petitioner is required to show that counsel

21   made errors so serious that counsel was not functioning as the "counsel" guaranteed by the

22   Sixth Amendment.  *See Strickland*, 466 U.S. at 687.

23       **B. Discussion**

24        Petitioner first argues that trial counsel was under the influence of drugs.  Petitioner

25   provides no support for this assertion in the petition but instead states that confirmation will

26   be provided upon request.  Petition at 17.  It is difficult to address this claim as petitioner

27   has provided little support.  *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory

28   allegations which are not supported by a statement of specific facts do not warrant habeas

United States District Court
For the Northern District of California

1 relief."). A review of the exhibits provided indicate that this claim was never presented in

2 state court on appeal or in a habeas petition.[4] An ineffective assistance of counsel claim

3 was raised on appeal but there was no reference to trial counsel being under the influence

4 of drugs. The only reference to drugs is in the trial record in petitioner's motion for a new

5 trial. CT at 545. New counsel stated the following in the motion:

6      It is clear from the declaration of Stephen Elrick [new counsel] filed on March
       10, 2008, that former defense counsel, Rick Ehler, has a significant drug
7      abuse problem. More particularly, he was using illicit stimulant drugs in the
       following periods: 1994-1995; for over 18 years prior to August 16, 1994; from
8      at least December, 2006, until close to the present time.

9      The only question is whether Mr. Ehler [trial counsel] was, in fact, using drugs
       during the course of the trial. [Petitioner] believes that he was, and has stated
10     in his declaration.

11 CT at 545. This court does not have the declarations referenced in the motion, neither from

12 new counsel nor petitioner, as they were sealed. CT at 637.[5] Petitioner was charged in

13 this case on September 8, 2006. Trial commenced in November 2006, and petitioner was

14 found guilty by the jury on November 30, 2006. It is unclear if trial counsel was under the

15 influence of drugs during trial.

16      Respondent has not raised the exhaustion issue nor has petitioner requested a stay.

17 Federal courts may not grant a writ of habeas corpus brought by a person in custody

18 pursuant to a state court judgment unless "the applicant has exhausted the remedies

19 available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). A federal constitutional

20 claim is exhausted when it has been "fairly presented" to the highest state court and that

21 court has had a meaningful opportunity to apply controlling legal principles to the facts

22 underlying the claim. *Picard v. Connor*, 404 U.S. 270, 276–77 (1971). The court may deny

23 a petition on the merits even if it is unexhausted. *See* 28 U.S.C. § 2254(b)(2). The court

24 may do so, however, "only when it is perfectly clear that the applicant does not raise even a

25

26      [4] It is not clear if petitioner is attempting to present a new claim or is merely providing
more information to support his argument on how trial counsel was deficient.

27      [5] The hearing regarding the motion for a new trial discussed the jail phone
conversations, but not any drug use of trial counsel. The trial court denied the motion for a
28 new trial and stated that trial counsel effectively represented petitioner. RT at 945-46.

United States District Court

For the Northern District of California

1  colorable federal claim." *Cassett v. Stewart*, 406 F.3d 614, 623-24 (9th Cir. 2005).[6]  As will

2  be discussed below, petitioner has not presented a colorable claim as he only theorizes

3  trial counsel was using drugs during trial, and regardless, trial counsel was not deficient

4  and there was no prejudice.

5      To the extent petitioner argues that counsel was *per se* ineffective due to drug use,

6  petitioner is incorrect and he must still demonstrate how counsel's alleged drug use

7  affected his trial performance.  *See Bonin v. Calderon*, 59 F.3d 815, 838 (9th Cir. 1995);

8  *see also Berry v. King*, 765 F.2d 451, 454 (5th Cir. 1985) (relevant inquiry is whether trial

9  performance was deficient and caused prejudice, not drug use); *McDougall v. Dixon*, 921

10  F.2d 518, 535 (4th Cir. 1990) (it is petitioner's burden to show that medication caused

11  actual failure to render adequate assistance); *Smith v. Ylst*, 826 F.2d 872, 876 (9th Cir.

12  1987) (attorney's mental illness is not ineffective assistance per se, but actual trial conduct

13  must be evaluated).  In fact, even a drug-addicted attorney does not constitute an

14  automatic violation of *Strickland*, nor does it create a presumption of ineffective assistance

15  of counsel.  *See Kelly v. United States*, 820 F.2d 1173, 1176 (11th Cir. 1987) (finding that

16  despite counsel's drug addiction, a review of the record did not reveal that counsel was

17  acting under a diminished capacity).

18      To the extent that petitioner argues that the alleged drug use supports his assertions

19  that counsel was deficient, petitioner has still failed to demonstrate counsel was deficient or

20  that he was prejudiced.  Petitioner first argues that trial counsel was ineffective for failing to

21  obtain the jail phone conversations.  That claim is denied as even if trial counsel was

22  deficient there was no prejudice for the reasons discussed in the claim above.  Of course it

23  would be difficult to demonstrate that trial counsel was deficient as petitioner made the

24  phone calls using three-way phone numbers that made obtaining the recordings extremely

25

26      [6]  To the extent that petitioner is not raising a new claim, but is presenting additional
27  evidence not provided to the state courts, this court cannot consider evidence that was not
presented to the state courts.  *See Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011) (habeas
28  review under Section 2254(d)(1) is limited to the record before the state court that adjudicated
the claim on the merits).

United States District Court

For the Northern District of California

1   difficult.

2       Petitioner's remaining argument that he was prejudiced by trial counsel's

3   performance involves general allegations that trial counsel did not properly respond to

4   prosecution objections.  On appeal petitioner argued that the prosecution committed

5   misconduct by objecting so often and to the extent that any claim of prosecutorial

6   misconduct was deemed forfeited by trial counsel's failure to raise the issue, then trial

7   counsel was ineffective.[7]  *Corbett*, 2011 WL 18733 *21; California Supreme Court Petition

8   for Review, Answer Exh. J at 13.  The court of appeal denied the claim of prosecutorial

9   misconduct in detail, analyzing many objections from the prosecution for various witnesses.

10  *Corbett*, 2011 WL 18733 *12-21.  The court of appeal found that petitioner's assertions

11  were not supported by the record.  *Id*.  The court of appeal then found that there was no

12  ineffective assistance of counsel as there was no prosecutorial misconduct that trial

13  counsel was deficient in opposing  *Id.* at 21.

14      In this federal petition, petitioner makes no specific arguments concerning how the

15  state court opinion was an unreasonable application of *Strickland*.  He simply repeats

16  allegations from his state petition that the prosecution raised many objections and trial

17  counsel's responses were "lackluster at best, and certainly not zealous."  Petition at 12.

18  Petitioner is not entitled to relief as his conclusory allegations are not supported by any

19  facts.  *See Borg*, 24 F.3d at 26.  A review of the state court opinion and trial record does

20  not support plaintiff's assertions, nor does the record reflect that trial counsel was

21  ineffective in responding to the prosecution's objections.

22      Petitioner only briefly addresses prejudice, in regard to the testimony of Willis

23  Gaylord.  He states that trial counsel was ineffective for allowing the prosecution to explain

24  away any violent tendencies of the victim's mother toward the victim.  Gaylord died prior to

25  trial, so petitioner is referring to prior testimony that was read into the record.  Petition at 15;

26  CT at 361-87.  None of the prosecution's objections or redirect examination were

27

28      [7] In this petition, petitioner only raises a claim of ineffective assistance of counsel.

United States District Court

For the Northern District of California

1   inappropriate.  With respect to this witness, the prosecutor never objected, but only once

2   interrupted because she did not understand the answer to a question on direct

3   examination.  CT at 370-71.  Petitioner faults trial counsel for allowing the prosecution to

4   "explain away any violent tendency of [the victim's] mother. . . ."  Petition at 15.  The

5   prosecution asked the witness how the victim's mother emotionally and physically

6   intimidated the victim, and specifically how the victim's mother spanked the victim.  CT at

7   377.  The prosecution's line of questioning was not improper.  On direct examination, the

8   witness was questioned regarding how the victim's mother acted violently towards her (CT

9   at 368) and the prosecution was free to ask clarifying questions regarding the subject.

10  Petitioner has not shown that trial counsel was deficient in failing to object to the

11  prosecution's questions or that he was prejudiced as a result.

12       Petitioner has failed to demonstrate that the state court opinion was an

13  unreasonable application of Supreme Court authority and ultimately his conclusory

14  allegations with little or no support do not warrant habeas relief.  This claim is denied.

15  **III.   Appealability**

16       The federal rules governing habeas cases brought by state prisoners require a

17  district court that denies a habeas petition to grant or deny a certificate of appealability

18  ("COA") in the ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll.        §

19  2254 (effective December 1, 2009).

20       To obtain a COA, petitioner must make "a substantial showing of the denial of a

21  constitutional right." 28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the

22  constitutional claims on the merits, the showing required to satisfy § 2253(c) is

23  straightforward:  The petitioner must demonstrate that reasonable jurists would find the

24  district court's assessment of the constitutional claims debatable or wrong."  *See Slack v.*

25  *McDaniel*, 529 U.S. 473, 484 (2000).  Section 2253(c)(3) requires a court granting a COA

26  to indicate which issues satisfy the COA standard.  Here, the court finds the two claims

27  presented by petitioner in his petition meet the above standard and accordingly GRANTS

28  the COA.  *See generally Miller-El*, 537 U.S. at 322.

The claims are:

(1) whether the prosecution failed to provide exculpatory or impeachment material in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); and

(2) whether petitioner received ineffective assistance of counsel.

Accordingly, the clerk shall forward the file, including a copy of this order, to the Court of Appeals.  *See* Fed. R. App. P. 22(b); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).  Petitioner is cautioned that the court's ruling on the certificate of appealability does not relieve him of the obligation to file a timely notice of appeal if he wishes to appeal.

### CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.

A Certificate of Appealability is **GRANTED**.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: January 21, 2014.                                       _____
                                                                        PHYLLIS J. HAMILTON
                                                                        United States District Judge

G:\PRO-SE\PJH\HC.12\Corbett2070.hc.wpd